Case number 18-1698 Virgin Islands Port Authority v. United States Good morning, Your Honors. Before I get into the 1994 Memorandum of Agreement that I think is the crux of the trial court's error here, I'd like to put a little bit of context briefly around that issue that I think will help clarify how we think about the error. Your Honor, the trial court found that the roughly $10 million in fees at issue here was the Port collected and retained that money over our objection and has that money in its pocket to this day. Finally, it's undisputed that from 2007 through 2010, CBP collected and kept that money under color of federal law that it subsequently conceded was inapplicable. Now, Your Honors, if we leave the MOA out of it for a moment. Okay, but I'm not sure what that has to do with it. I mean, it looks to me as though Section 1469C authorizes Customs to collect fees if someone requests them. Correct. Right? And it seems to me that what we really have here is an agency problem. That for some period of time, the Virgin Islands government requested the U.S. government to collect these fees, and then at some point, it suggested that it didn't want that anymore. And I guess if the Virgin Islands had simply said to the U.S. government, stop collecting these fees, and the United States had continued to collect these fees, you might have an illegal exaction. Your Honor, I believe that is what we Well, let me finish. Sure. But your problem, it seems to me, is that you didn't say stop. You knew that they continued to collect the fees, and you didn't tell them to stop. You kept trying to negotiate with them to make a change to the memorandum of agreement. So why should it be that they lacked authority to continue to collect these fees when you were not clear that you wanted them to stop immediately? Your Honor, I disagree with the premise that we were not clear. I think we were crystal clear. We did two things to revoke the authorization that they purportedly had. One, we took the instructions out of our marine tariff that ordered mariners to pay these fees to customs. That had been in place since 1969, and we would submit was the original authorization. Second, we went to them. We sent them a letter in 2007 stating two things explicitly. One, the MOA doesn't have anything to do with the Port Authority. We're not a party to it. And two, you are wrong that you are required to collect these fees. Well, under the law of agency, it doesn't make any difference if a revocation is contrary to an agreement. But your Honor, let me finish. Under the law of agency, you can revoke authority even if it's in violation of an agreement. That would give the agent the authority to sue for damages perhaps, but that's not what's to me need to be clear that you want them to stop. And for years, they continued to collect, and you continue to negotiate with them and you didn't tell them to stop. Your Honor, our 2007 letter expressly requested that they stop. They expressly considered it a request to stop and refused it flatly. I'm not sure what else we could have done in those circumstances other than start a war with the Customs Service, which would not have been beneficial to anyone. Of course, we continued to negotiate, but we never conceded that the power they were asserting was correct. And indeed, they subsequently admitted that it was not. If there was an agency relationship here, which I'm not sure of, who's the principal? I think the assertion under the theory that Judge Dyke was positing, it would be that VIPA, which owns the fees, must be the principal because it's our property and that the government of the Virgin Islands was the agent negotiating on our behalf. No, no, no, no, no. It's that the Virgin Islands government is the principal and perhaps the authorities is acting with their authority, but the Virgin Islands government is the principal and the United States Customs Service is the agent. Oh, I see what you're saying. I see what you're saying. Your Honor. And so if you're talking about terminating the relationship, the third party, beneficial interest, which would be VIPA, isn't the one that would be signaling the intent to terminate. It's going to be in Virgin Islands. Well, two points, Your Honor. And that's what Judge Dyke was pointing out, is that Virgin Islands seems to continue to think that the only way to terminate is by amending the MOA. Your Honor, that's... You will note, Your Honor, that VIPA's request to CBP in 2007, it was expressly endorsed by the governor of the Virgin Islands on behalf of the United States. I saw that. But well after that, the governor talks about we're continuing to do this pending the negotiations to amend the MOA. Your Honor, that's... I mean, we are in a bit of a trick box here because that's because they were insisting sort of... CBP was kind of talking out of two sides of its mouth at this point. They had two below. I don't... We looked at the briefing below on the question of whether or not the agency was terminated, wasn't litigated. Your Honor, I don't believe, Your Honor, here the underlying premise of this entire line of our... I'm sorry. That's correct. The agency, you did not argue below that there was an agency relationship here that was terminated in 2007. No, Your Honor, and I don't think we needed to because... I just want to clarify. No, that's correct. This line of argument has never really been pursued by either side. Your Honor, all of that, the agency relationship argument assumes that the 1994 MOA is in fact an authorization for CBP to collect these fees. If it's not, then the relationship between... Then the government of... Excuse me. Forgive me. The government of the Virgin Islands involvement is not even really relevant to the question. We own the fees. The district court, excuse me, the trial court found as much. We put in a substantial amount of evidence and argument suggesting that the MOA is simply a writing that deals with reimbursement questions, not with the authorization of the underlying activity. Remember, the trial court's decision is dependent entirely on the finding that CBP's conduct was authorized by this agreement. If that's not true, then our instructions to them in the 2006 marine tariff and the 2007 letter... They were authorized by the agreement. They were... For years, they were collecting the fees. Until 2007, how could it be that there wasn't any authority to collect the fees? Your Honor, I want to be very... Do not interrupt me, please. How can it be that there was no authority to collect those fees during that period of time before 2007? Your Honor, I want to be very clear about this. We are not arguing and have never argued that there was no authority prior to 2007. We freely concede that they did this with our permission for the better part of 40 years. The question is whether could they keep doing it once we ask them to stop. The answer to that, Your Honor, is no. And the reason that it's no is that there's no basis for them to continue doing it lawfully once we've requested that they cease doing it. There has to be a statutory basis for them to take our money lawfully and not have to give it back. They asserted for three years that it was 1406 H&I. It's not. They've conceded that. They subsequently asserted that it's 1469 C and the MOA and that the authorization theory applies. But, Your Honor, I think, and we've explained, tried to explain, I think, with some success, why it is that the MOA, as you pointed out, can't possibly be the authorization. And if it's not the authorization, then the trial court had to be wrong that we couldn't revoke the authorization without an amendment. That doesn't make any sense to me. I mean, there was a, whether the authorization came from the MOA or someplace else, there was an authorization. Now you're, the claim here is for fees for 2008 to 2011, correct? I believe that's correct, Your Honor. So why, is it because of the statute of limitations that there's no claim for 2007 or what's the reason for that? Your Honor, I believe, I'm actually not sure on, in my own mind, whether the claim is for 2007 or it starts in 2007 or 2008. I think if it's 2008, it would be because they only responded to us denying our request toward the end of 2007. So we couldn't claim, I think, maybe, I'll be honest, I don't know the answer, Your Honor. I think the, our position is that at least from the moment they declined our request to collect our own fees, they were collecting them unlawfully. That happened in the end of 2007, for the end of 2007. Where is it that the governor of the Virgin Islands revokes the authority of customs to collect the fees? Your Honor, the governor of the Virgin Islands never gave authority. The Port Authority, which owned the fees, had to give them that authority. We gave them that at a minimum in 1969 when we added to our marine tariff that those fees should be paid to customs. We removed that authority in 2006 when we published our new tariff. Well, under whose law will we decide all that? Isn't that Virgin Islands law? I mean, did VI have any authority to speak on behalf of the Port Authority? Yes or no? How do we know that? Your Honor, that was, to an extent, the subject of a dispute below. That part of the lower court's rationale is the problem here is it's not a violation of U.S. law. It may have been a violation of Virgin Islands law. I don't, unless you assume that the MOA, which was signed only by the government of the Virgin Highlands, was the source of authorization, then you don't need to get into that question. We don't, we have no, there is no dispute between the Port Authority and the government on this to collect these fees. Correct. Whatever the source of that authority might be. Correct. If the authority has to come from the governor of the Virgin Highlands, at some point he has to have revoked the authority of customs to collect the fees. Where did he do that? Two answers to that. First of all, Your Honor, the premise of your question is incorrect. The governor of the Virgin Highlands did not have to give this authority because the fees didn't belong to the governor of the Virgin Highlands. It belonged to the Port Authority. The government of the Virgin Highlands had nothing to do with it. And secondly, to the extent the governor, the government, had to revoke the authority, it did so by approving, expressly in writing, by the chief executive, VIPA's request to collect its own fees. Could I ask a question on the exaction point? Can, all the cases that I read where an illegal exaction was found, the party who was claiming it was exacted actually paid money out of its pocket directly to someone, either to the U.S. government or to someone else the government owed some money to? True, Your Honor. As far as a direct, the money has to come right out of the pocket. Now, the money didn't come right out of the pocket here. No, but Your Honor, as the trial court... So I'm just saying, the whole notion that Judge Brugge seemed to think that there was nothing that came out of the pocket of VIPA here, from my perspective, they haven't satisfied the test of exaction. Your Honor, as Judge Brugge, I think, quite capably explained, the test under Eastport and Arialinus is a direct payment or an ineffect payment. An ineffect payment is clearly not a direct payment, right? It has meaning other than that. The only case law you have where an ineffect payment is where, Arialinus, where a party paid some money to someone the government owed the money to, but they actually paid money out of their own wallet. And there's no money coming out of the wallet here. So I'm not inclined to, there's a waiver of sovereign immunity issues underlying this issue. So why should I extend, for the facts of this case, to say that there was an exaction in the first place? Well, Your Honor, I think the case here is actually stronger than it was in Arialinus, which is also an ineffect case. But there's no money coming out of the pocket. There's no money. I'm simply saying that case law, the only, can you cite me a case where an exaction was found, where money did not come directly out of the pocket of the party exacted? No, Your Honor. So this would be the first case. This would be the first case. But, Your Honor, I submit to you, it is wholly consistent with a theory of illegal exaction. If the government could avoid illegal exaction simply by stepping in between someone's money and their own receipt of it, you're just licensing conversion. I mean, if there's not, if there's a better case for an ineffect payment. Well, the question is, if we're really in your favor on the exact issue in this case, we are opening a door. And the question is, is the door more favorable to the government? Or if we close the door, is it more favorable to government? Your Honor, I don't believe you are opening a door. I mean, if you look at Arialinus there, I mean, you could make a very similar, probably a better argument there, that in fact, there was no payment to the government. No money entered the government's coffers, right? The court had no problem there stating that a payment to a third party. The exaction doesn't deal with my money coming out of the government. It's my going to the government. It requires a showing that the government has the plaintiff's money in its pocket. There, the governor only had it in a very virtual sense. I just wanted to clarify that this would be the first case. Yes, I agree with you, Your Honor, on these exact facts. Your Honor, I'm well into my Thank you. Ms. Speck. Your Honor, Elizabeth Speck for the United States. May it please the court. Okay, so why, what remedy would they have if this doesn't fall under the illegal exaction heading? Your Honor, we submit that their remedy is with the government of the Virgin Islands, this agreement. No, no. What remedy would they have against the United States? They say that you have kept money which belongs to them, that the customs authority was revoked, and we have to assume that for purposes of determining the illegal exaction theory. Why isn't that a legitimate illegal exaction theory, one? And two, if it isn't, what is their remedy? We submit it's not a legitimate illegal exaction theory because, one, the government's conduct was authorized by federal statute. No, no, no, no, no, no, no. You can't go there. That's the merits. We have to assume that at this stage in determining jurisdiction, we have to assume that they have a good claim. Their claim is you once had the authority, customs once had the authority to collect, that authority was revoked, customs continued to collect, that's an illegal exaction. So why is that not an illegal exaction theory, if their proof is forthcoming on the violation of federal law? To the extent they disagree that the government of the Virgin Islands was incapable of executing this agreement with the United States, that's a claim based on Virgin Islands law. And the court, the circuit's law is clear. Please, accept my theory of what their merits argument is. Their merits argument is the United States under 1469C has the authority to collect fees if it's authorized by the Virgin Islands. Their theory is that authority was revoked, that customs no longer had the authority to collect these fees, and that by keeping the money and continuing to collect, the government engaged in an illegal exaction. That's their theory, okay? I know you dispute whether the facts support that theory, but let's put that to one side for the moment. Why is that not a legitimate illegal exaction theory, that the government without legal authority collected money that belonged to the Virgin Islands? Well, Your Honor, you're stating an illegal exaction claim, but we would dispute here that there's a violation of federal law. Here, I mean, I'm not sure how else to answer Your Honor's question. There's an illegal exaction when you can establish an exaction and that the government acted in contravention of the Constitution, statute, or regulation. What remedy do they have against the government if it's not an illegal exaction? Your Honor, we've maintained for a long time they're not the proper party in interest. We've maintained that here- I understand that, but under the hypothetical, what remedy do they have against the U.S. government? We would maintain they don't have a remedy against the United States. Is there a taking? Well, no, because the conduct, I believe you have to say, under a taking, you would say that the government's conduct, that they would have to agree that the government's conduct was authorized, and that was litigated below and also in the government, well, the main claim, they pursued a taking and an illegal exaction claim. Here, we submit that there's not the proper party to be bringing this claim. They tried to- I understand that, but let's assume that they are for the moment. What is the remedy if it's not an illegal exaction? Your Honor, given that they dropped their implied contract claim and they dropped their third party beneficiary claim, an illegal exaction would be the only thing left, but here we would submit they're not the proper party to be bringing that claim. We've argued all along the government- It's a different issue. It's a different issue. Maybe they aren't the proper party, and that might be a ground on which you win, but it's not a ground for saying it's not an exaction. Your Honor, the agreement is- I'm not sure where the court wants me to go. We believe there's not an exaction. We've also submitted that the government didn't act in contravention of federal law. Okay, let's talk about the revocation of authority. So why is it that the 2007 letter wasn't effective to revoke customs authority to collect? Your Honor, first of all, I think that assumes that the government has ever had a direct relationship with the Port Authority, that there's no merit to that claim. Through the memorandum of agreement, the Port Authority never received any money directly from the U.S. government. It all was worked through this memorandum of agreement. Money was deposited into the Virgin Islands Deposit Fund once it was collected. The government's fees were subtracted, and then it was remitted to the Treasury of the government of the Virgin Islands. The only way they ever got their fees was through a separate agreement with the government of the Virgin Islands that they have never produced. This claim is only an effort to revive their withdrawn implied contract claim. Suppose the governor of the Virgin Islands had said to customs, to the United States, stop collecting these fees. I revoke your authority to collect these fees on behalf of the Virgin Islands. I want you to stop, and that's all that happened. Could customs have continued to collect? That's not the way the procedures work through the memorandum of agreement. Answer my question. No, your honor, not under the memorandum of agreement. Forget the memorandum of agreement. Let's assume that there was a different memorandum of agreement in which the governor himself authorized the collection of the fees, and then comes a point in 2007, he says stop collecting the fees. Can customs continue to collect the fees under those circumstances? I think it depends on what the language of the agreement says. I just gave you the language of the agreement. It's a hypothetical. Well, if the agreement specifically said that oral notification to stop collecting the fees would be sufficient, then that would be a different case. But here we have... The restatement of agency doesn't make a revocation of authority depend on whether it's in compliance with an agreement or contrary to an agreement. The restatement says you can revoke authority even if it's in violation of an agreement. So let's just accept that for the stop collecting the fees, wouldn't customs have to stop collecting the fees? Again, your honor, if you had an agreement that provided for that, I think here we have a statute that says... You're not answering my question. I'm assuming that you had the authority, customs had the authority, and the governor says stop. You're assuming a case that is not the facts of this case. Well, that's correct. And when you come to oral argument, and this may be a surprise to you, supposed to answer hypothetical questions. It happens. I'm asking a hypothetical question. What's the answer to it? If that's the hypothetical, then yes, but I would maintain that the facts of that hypothetical are distinguishable from the facts of this case in which you have a memorandum of agreement which states in pertinent parted appendix at article 14... Yes, they'd have to stop collecting under the hypothetical. Yes, your honor. Okay. Go ahead. But your honor, again, I would submit that this is a different circumstance. Here we had a memorandum of agreement. We have a statute that says the government can provide services on a reimbursable basis. That is 48 U.S.C. 1469C. You also have a stat that appendix 45, article 5 says customs will seek and is entitled to reimbursement for the cost of line activities in the USVI district, which explicitly included warfage and tonnage. You have article 11 at appendix 50 that states that customs will be They can violate the agreement and revoke the authority. They're not bound to follow the agreement. Yes, they are, your honor. Wait, wait, please do not interrupt. Under the restatement of agency, a principal can revoke an agent's authority even if it's contrary to an agreement. Your honor, these issues have never... I mean, again, looking at the federal statute, which requires the court to look at the reimbursable services agreement, which is what we have, which says... The federal statute doesn't require looking to an agreement. Yeah, it says to the extent practicable services facilities and equipment of agencies and instrumentalities in the United States may be made available on a reimbursable basis. I mean, here we explicitly have an agreement, and the record supports that this agreement is the only thing that ever facilitated the government's collections in the Virgin Islands. As the court can see at appendix 212, they withdrew their implied contract claim. They claimed repeatedly there was some other source that governed this arrangement, and there's been absolutely nothing to support that. The tariff said only where port users are to pay money, and they relied extensively on Ms. Penn's deposition testimony, but she couldn't provide any particulars about any agreement between the United States and the Virgin Islands other than to say the process was the process was the process. So all anyone's been operating under since 1994, and before that, 1992, was this memorandum of agreement. And there's simply nothing in the record that would support, and indeed, they dropped their summary judgment claim that there was any separate authorization or arrangement between the United States government and the port authority. The only arrangement here has been between the United States government and the government of the Virgin Islands, and to the extent there's a dispute as to whether the United States could negotiate with the government of the Virgin Islands, that's an issue of Virgin which is not, as the court correctly concluded, is not cognizable under an illegal exaction theory, which has never been expanded to include sources of foreign law. The court has no further questions. We respectfully request that the court affirm judgment. Do you take the position that you disagree with the lower court when he said there was an indirect payment here? Yes, Your Honor. We would say that... You heard my discussion with Mr. Eaton. Are you of the view that this should not be the first case in which we say there is an exaction where there was no actual money coming out of the pocket of the party supposedly exacted? Yes, Your Honor. Our position is it would be an unwarranted expansion of the illegal exaction doctrine. Whenever the court has talked about the doctrine, in essence, you got a little two pieces because we're talking. The court concludes there was no illegal exaction because the problem, if any, was a violation of Virgin Islands law as opposed to U.S. law because the U.S. was authorized. Its authority to do this wasn't terminated. So on the question of exaction, you contend that there was not an exaction because there was no actual money coming out of VIPAS' pocket and going either to the government or to somebody else, right? Yes, Your Honor. Okay. Okay. Thank you. Mr. Eaton, you have two minutes. Your Honor, I'll be very brief. To return to the issue of revocation of authority, Your Honor, if you look at the letter that we provided to CBP in 2007, it does two things. It says about the MOA, which rewind one moment, in 2006, CBP initially told us, yes, you can start collecting your own fees, but we have to amend the MOA. We then submitted this letter to CBP saying two things. Look, one, the MOA has nothing to do with us. These fees belong to us. The government made that agreement. It's not about whether you collect these fees or not. It's just about the methodologies of reimbursement. We also said you are incorrect that you are required by federal law to collect these fees, a position which turned out to be correct. It then specifically requests that we start collecting our port fees. When they responded, they interpreted that letter as a direct request for them to stop doing what they were doing, and they rejected it, and they rejected it on the basis that they were required by law to reject it. Remember, their position here is not you failed to deauthorize us. It's that you can't deauthorize us because we're required by federal law to do what we're doing. They maintained that position until at least in August of 2010. During that period, there was nothing we could have done to deauthorize their conduct. That was their position. They're the federal government. We couldn't simply stamp our feet and stop doing what they wanted us to do. We have a very important relationship with CBP that had to be maintained. They do a lot of things that they're required to do, and that they do on a reimbursable basis for us, so we continued to engage with them. The important fact here is that there was absolutely nothing we could have done on their theory to deauthorize their conduct until August of 2010 when they switched to this reimbursable services rationale and dropped their mandate rationale. Your Honors, that's all that I have. Okay, thank you. Thank both counsel. The case is submitted.